UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

YVETTE BRAVO,

NO. CIV. S-08-1982 LKK/EFB

        Plaintiff,

    v.

THE UNITED STATES LIFE
INSURANCE COMPANY IN THE
CITY OF NEW YORK; and DOES 1
through 20, inclusive,

        Defendants.

_____/

**O R D E R**

    This is a state law disability insurance benefits action. After plaintiff collected total disability benefits for one year, defendant insurer terminated her benefits, claiming that plaintiff was not totally disabled.  Plaintiff filed suit for breach of contract and insurance bad faith, i.e., tortious breach of the implied covenant of good faith and fair dealing.[1] Before the court

---

    [1] The parties agree that ERISA does not apply to this action. It appears that the plan at issue falls into ERISA's exemption for governmental plans, ERISA § 4(b)(1).

1

is defendant's motion for summary judgment. The court resolves the matter on the papers and after oral argument. For the reasons explained herein, defendant's motion is denied.

## I. BACKGROUND[2]

### A. Summary

Plaintiff began working for the Stockton Unified School District in 1993.[3] Her duties were essentially constant, although her job title changed several times over the years. As described by her employer, plaintiff's "essential job functions" included "exercise manual dexterity necessary to operate typewriter/computer or calculator," "sit for long periods of time," "make arithmetic computations manual or with calculator, [sic]" and "type at a speed of 40 wpm and operate other common office equipment." Pl.'s Ex. 7, 228. In a form submitted in connection with plaintiff's

---

[2] Defendant moves to strike the "Separate Statement of Undisputed Facts" filed by plaintiff. A party opposing summary judgment must dispute the moving party's statement of moving facts, and the opposing party "may also file a concise 'Statement of Disputed Facts.'" Local Rule 260(a); see also Fed. R. Civ. P. 56(e)(2). The court construes plaintiff's submission as a statement of *disputed* facts; as such, defendant was not obliged to respond with a designation as to which of these facts are and are not in dispute. The court rejects defendant's separate contentions that the statement impermissibly incorporates additional briefing in violation of the page limits set by the court, or that the statement should otherwise be rejected.

Defendant also objects to various evidence offered by plaintiff. Some of this evidence is not necessary to the resolution of the instant motion. To the extent that the challenged evidence is relevant and the court has relied on it herein, the objections thereto are OVERRULED.

[3] Defendant claims that plaintiff was hired in 1996. The court credits the non-moving party's evidence; in any event, this dispute is not relevant to this motion.

disability application, plaintiff's supervisor stated that plaintiff's position required her to stand 0-2 hours, walk 0-2 hours, and sit 4-5 hours in an 8 hour work day,[4] to occasionally lift or carry 0-10 pounds but not more, to use her hands for simple grasping and fine manipulation, and to occasionally bend, squat, twist, turn, and reach above her shoulders. Id. at 281. In 2006, plaintiff's job title was "office assistant."

Plaintiff suffers from degenerative disk disease and fibromyalgia. She began seeing doctors regarding neck and back pain in 1997. Bravo Decl. ¶ 4. A March 24, 2006 MRI of her cervical spine revealed "significant disc protrusions" throughout the cervical spine, with varying degrees of encroachment, from moderate to severe, with severe encroachment at C3-4, and uncinate spurring.[5] Degenerative disk disease may lead to chronic pain. As discs degenerate, bone spurs may grow and the spinal canal may narrow, compressing the nerves that run through it, which may cause pain of varying duration and intensity. The pain may be relieved by lying down. Defendant agrees that plaintiff suffers fibromyalgia, degenerative disk disease, and depression. Defendant

---

[4] The court notes that if the entire eight hours are spent standing, walking or sitting, then these ranges cannot be correct. For example, if plaintiff spends no time standing (as her supervisor stated was possible), the remaining time adds up to only seven hours at most.

[5] "Uncinate" may mean "1. Hooklike or hook-shaped. [or] 2. Relating to an uncus or, specifically, to the uncinate gyrus (2) or a process of the pancreas or of a vertebra." Stedman's Medical Dictionary, 27th Edition (2000). The parties have not indicated which meaning is applicable here.

merely disputes whether these conditions render plaintiff disabled.[6]

Plaintiff ultimately determined that the pain caused by these conditions was so severe that it prevented her from working. She stopped working on June 12, 2006. Through her employment, plaintiff had a disability insurance policy issued by defendant. On July 6, 2006, plaintiff applied for long term disability benefits under this policy, based on neck and back pain. Dr. Le, plaintiff's treating orthopedic surgeon, completed an "attending physician statement" in connection with plaintiff's claim, in which Dr. Le stated that plaintiff was totally disabled.

Defendant approved plaintiff's claim for disability benefits by letter dated August 21, 2006, concluding that her benefit period began on August 7, 2006. In the following ten months, various persons reviewed plaintiff's claim and condition, as discussed in detail below. Defendant ultimately asserted that plaintiff was able to perform her job functions and that plaintiff was not entitled to disability benefits. Defendant terminated plaintiff's benefits effective June 12, 2007. Plaintiff "appealed" this decision through defendant's internal process, and her "appeal" was denied.[7]

---

[6] One would think that, since this is a question of fact, the opinion should stop here. Nonetheless, a more extended opinion, dealing with the factual basis for this disagreement, seems appropriate.

[7] It is customary to speak of an insurance company's internal review process as an appeal. The problem with such a characterization is that it suggests something akin to an appeal

## B.    The Policy's Definition of Disability

The insurance policy at issue in this case defines disability, for purposes of the first two years after a claim is filed, as "the complete inability of the employee to perform the material duties of his regular job; 'his regular job' is that which the employee was performing on the day before total disability began."  Pl.'s Ex. 7, 20.  The policy further provides that "to be considered totally disabled, . . . an employee must also be under the regular care of a physician."  Id.

Another section of the policy imposes the following limitation:

> You must be under the ongoing care of a Physician in the appropriate specialty as determined by us, during the Benefit Waiting Period.  No LTD Benefits will be paid for any period of Disability when you are not under the ongoing care of a Physician in the appropriate specialty as determined by us.

Id. at 26.

Plaintiff argues that the policy's definitions of disability are unenforceable because the policy was not approved by the California Insurance Commission.  On the day before oral argument (i.e., after briefing on this motion was complete) the parties submitted extensive uninvited briefing on the factual question of whether the commission had approved the policy, although neither

_____

under principles developed under administrative law.  It is, of course, no such thing.  Rather, it is a private, for profit, organization making judgment as to its exposure to suit. While for convenience the court adopts the customary usage, such characterization presents opportunities for error.

party has provided any briefing as to the law on this issue.  The

court resolves the instant motion on other grounds, and does not

determine whether the policy was approved or what effect non-

approval would have.

**C.   Plaintiff's Self-Evaluation**

Plaintiff describes her pain as disabling.  She declares the

following:

> I am in constant pain, which makes it
> difficult for me to do anything at a
> reasonable pace.  The pain is constant, but
> some days are so bad I have to lie down
> throughout the day. Most days, I get up at
> 4:00 a.m. or 5:00 a.m. in the morning and go
> to sleep at 4:00 p.m. in the afternoon.  After
> I get up, I spend about an hour sitting on the
> couch, laying my head back, resting it and/or
> rolling it and massaging it to relieve my
> pain.  I do small chores for 30 to 45 minutes,
> but sit down on the couch most of the day,
> resting my head throughout the day.  When I do
> simple house chores like washing dishes I have
> to rest for an hour or two afterwards to
> relieve the pain.  I cannot sit in a chair,
> even an ergonomic chair, and work for any
> sustained period of time (less than an hour).
> If I go shopping or take my mother out [or]
> for some reason am more active than normal for
> two or three days, even with a few hours of
> activity, I will have to take the following
> day and lay down all day to rest.  I have bad
> days, which occur unpredictably, roughly four
> to six times in a month, where I have to lay
> down in bed most of the day to relieve the
> pain.

Decl. of Yvette Bravo ¶ 11.  It should go without saying that this

evidence, in itself, would appear to defeat defendant's motion.

**D.   Health Care Professionals Evaluating Plaintiff**

Much of the other evidence in this case consists of statements

made by various health care professionals.  Six individuals

evaluated plaintiff in person.  These are:

> \* Nurse Practitioner Ross and Dr. Ecker, plaintiff's primary care providers.

> \* Dr. Le, plaintiff's orthopedic surgeon.

> \* Dr. Clair, a pain management specialist with Northern California Rehabilitation, whom Dr. Le referred plaintiff to.

> \* Steve Moon, who conducted a "functional capacities evaluation" of plaintiff at defendant's request.

> \* Dr. Seu, who evaluated plaintiff in connection with her claim for social security benefits.

In addition, two individuals conducted a record review of plaintiff's claims on behalf of defendant:

> \* Nurse Girard.

> \* Dr. Wagner.

**E.    Chronology of Plaintiff's Claim and Evaluations Considered by Defendant**

**1.    Dr. Le**

Dr. Le, an orthopedic surgeon, began seeing plaintiff in 2001. He diagnosed her with degenerative disk disease, but concluded that she was not a strong candidate for surgery.  Dr. Le last saw plaintiff on July 10, 2006, four days after plaintiff applied for long term disability benefits.  As noted above, he provided an attending physician's statement in connection with plaintiff's disability claim, wherein he stated that plaintiff was totally disabled and unable to perform her job or any other job.  Dr. Le initially stated that plaintiff would be able to return to work by

August 19, 2006, but after extending this date twice, he stated that plaintiff was permanently disabled on September 22, 2006.

On October 5, 2006, Dr. Le completed a "physical capacities questionnaire" provided by defendant. Dr. Le concluded that in an eight hour workday, plaintiff could sit for up to two hours, stand for up to two hours, and walk for up to one hour. Pl.'s Ex. 7, 202. Dr. Le further checked a box indicating that plaintiff could frequently (34-66% of the workday) perform fine manipulation with either hand. Id. at 203. Separate from this form, Dr. Le stated that plaintiff's "current restrictions and limitations" were that she could lift, push, or pull no more than five pounds. Id. at 200.

**2. Dr. Clair**

In the summer of 2006, Dr. Le referred plaintiff to Dr. Clair, a pain management specialist. Dr. Clair examined plaintiff and the report on her MRI on August 10, 2006. After this exam, Dr. Clair diagnosed plaintiff with cervical degenerative disc disease, lumbar degenerative disc disease, chronic pain, and probable right carpal tunnel syndrome. Asire Decl. Ex. A, 161 (Dr. Clair's report).

While Dr. Clair noted that plaintiff's conditions caused pain, he stated that "her subjective complaints of pain rated at a level 10/10 [are] out of proportion with her clinical objective findings." Id. at 162. Defendant argues that this statement indicates that Dr. Clair concluded that plaintiff overstated her own feelings of pain. This interpretation may draw support from Dr. Clair's statement in deposition that plaintiff did not visually

exhibit pain during various tests.[8]  Deposition of Dr. Clair, 71.

Plaintiff, relying on other statements made in Dr. Clair's

deposition, argues that Dr. Clair did not dispute that plaintiff

actually experienced '10 out of 10' pain, and that this statement

merely indicates Dr. Clair's conclusion that a heightened pain

response must be attributed to her fibromyalgia or other

conditions.  Deposition of Dr. Clair, 70-71.[9]  On defendant's

motion for summary judgment, pursuant to the standards for summary

---

[8] During Dr. Clair's deposition, defense counsel questioned Dr. Clair as follows:

> Q: Ms. Bravo's subjective complaint of ten out of ten, that's her subjective complaint, right?
> A. Yes.
> Q. Okay. That was - that is contradicted by your visual observance of her during the examination where you did not see her exhibit any pain during the compression test, during the Spurling's maneuver, during the femoral stretch, correct?
> A. Yes.

Deposition of Dr. Clair, 71.

[9] The court characterizes the parties as disputing whether plaintiff misrepresented her subjective experiences (and Dr. Clair's opinion as to whether there was any such misrepresentation).  This is not the only possible characterization.  In Dr. Clair's deposition, defense counsel asked whether "someone could be believing that they have a lot of pain when, in fact, they may not have a lot of pain?"  Clair Depo. 80.  This question may have asked whether plaintiff misunderstood how much pain was "a lot."  Alternatively, the question may have asked whether, even if plaintiff was truthfully reporting her subjective perception of pain, her perception could have been incorrect.  Insofar as the court understands pain to be a subjective phenomenon, the suggestion that a person's subjective perception of pain may be inaccurate is puzzling.  Nonetheless, Dr. Clair answered "yes" to the quoted question.  The court hopes that this philosophical quandary, while interesting, need not be resolved in this case.

judgment, the court assumes that the trier of fact will credit plaintiff's interpretation of these statements.

Dr. Clair's report contains no discussion of plaintiff's work capacity or of what restrictions, if any, are necessary. Pl.'s Ex. 7, 158-62.

### 3.   Nurse Girard's Record Reviews

Nurse Girard completed two record reviews on behalf of defendant.  The first review was completed on January 2, 2007, and included Dr. Le's statements, the MRI, and possibly other information, but not Dr. Clair's report.  Pl.'s Ex. 7, 175.  Nurse Girard concluded that the MRI findings were consistent with the ability "to perform at least at the sedentary to light physical demand level with the ability to alternate her position frequently."   Id. at 176. Nurse Girard further concluded that "[t]he restrictions and limitations from Dr. Le seem overly restrictive based on the medical available for review. [sic]" Id. Nurse Girard did not specifically discuss plaintiff's own reports. Nurse Girard recommended acquiring Dr. Clair's report, and possibly completing an activities assessment.   Id.   Whether a jury will credit the nurse's evaluation over the doctor's, is, of course, a matter for trial.

Nurse Girard completed a second review on March 19, 2007, after receiving Dr. Clair's pain management report.  Pl.'s Ex. 7 at 154.   This review asked whether the lifting, pushing, and pulling restrictions and limitations imposed by Dr. Le were "supported by the medical records."   Id.   Unlike the previous

10

record review, the second review did not mention the limits Dr. Le imposed with respect to standing, sitting, and walking. Id. at 155, 175. Based on the imaging results and Dr. Clair's report of objective symptoms, Nurse Girard concluded that plaintiff suffered degenerative disk disease, and that "[i]t is reasonable that the claimant may experience some pain given the anatomic findings on imaging; however, her symptoms seem to be in excess of her exam findings." Id. at 155. Nurse Girard again concluded that plaintiff could perform light physical activity provided that plaintiff could alternate positions as needed. Id. She did not discuss the specific duties imposed by plaintiff's former job, or whether that job afforded plaintiff an opportunity to change positions. Once again, all of this is simply grist for the trial mill.

### 4. The Functional Capacities Evaluation

In April of 2007, plaintiff underwent an eight hour "functional capacities evaluation" ("FCE") at defendant's request. Pl.'s Ex. 7, 134-145 (examiner's report). The FCE was administered by Steve Moon. This evaluation measured plaintiff's ability to perform various physical tasks. Moon concluded that plaintiff could sit for four and a half hours, stand for two hours, walk for forty-five minutes, and perform repetitive hand use for five and a half hours. Id. at 137. Moon concluded that plaintiff was therefore able to perform sedentary and light work. Although plaintiff performed very poorly on two manual dexterity tests, scoring in the 4th and 7th percentiles, Moon concluded that these

scores resulted from "self-limiting behavior." Deposition of Steven Moon at 165-66, 168-69. Moon also concluded that plaintiff's reports of pain were exaggerated.

Plaintiff states that she was in pain throughout the evaluation, but that she attempted to complete it because her benefits would be terminated otherwise. Bravo Decl. ¶ 13. After the evaluation, plaintiff stayed in bed for three days on account of her pain. Id. ¶ 14.

Defendant provided the FCE report to Dr. Le, asking Dr. Le to comment on the discrepancy between the FCE and Dr. Le's evaluation. Dr. Le acknowledged receipt of the report and the disparity, but explicitly declined to provide further comment. Pl.'s Ex. 7, 56-57.

### 5.  Termination of Plaintiff's Benefits

After receiving the results of the FCE, defendant concluded that plaintiff was capable of performing the duties of her job with the Stockton Unified School District. Defendant terminated plaintiff's benefits effective June 12, 2007. The termination notice stated that defendant had not found "medical evidence to support, with a reasonable degree of medical certainty that [plaintiff] had ongoing symptoms or an ongoing loss of functional capacity, which would preclude [her] from performing [her] job as an Office Assistant." Pl.'s Ex. 7, 130. Defendant had not received "copies of any objective tests that were used to support [Dr. Le's] findings" regarding plaintiff's capabilities. Id. at 129. The letter recited the physical job requirements provided by

plaintiff's supervisor, and stated that the FCE examiner had found that plaintiff met "the general strength and positional tolerances" of this job.  Id. at 130.

### 6.   Dr. Wagner's Record Review

Plaintiff submitted an "appeal" on June 22, 2007.   In connection with this "appeal", plaintiff submitted additional medical records, going back to 1997. When this "appeal" was filed, defendant hired Dr. Wagner to perform a third record review.  Dr. Wagner's report of August 16, 2007 concluded that plaintiff was able to perform the functions of her prior job.  Dr. Wagner did not personally review plaintiff's MRI films, did not speak with plaintiff's treating physicians, and did not speak with plaintiff. Plaintiff criticizes the report for failing to mention that plaintiff suffers from fibromyalgia and that plaintiff was taking morphine and methadone.

### 7.   Denial of Plaintiff's Appeal

On September 17, 2007, defendant issued its final denial letter.   This letter stated that the functional capacities evaluation "revealed that you have full-time sedentary to light work capacity in an eight hour day."  Although this letter referred to general definitions of sedentary and light work, it did not specifically refer to the physical requirements and essential job functions of plaintiff's former job.

### E.   Evidence Not Considered by Defendant

After plaintiff's "appeal" had been denied, on December 3, 2007, a "Physical Capacities Form" was completed describing

13

plaintiff's condition.  Pl.'s Ex. 5.[10]  This form states that
plaintiff can sit for two to four hours a day, and that plaintiff's
ability to complete tasks is limited because of "attention focused
on chronic pain, easily distracted.  Blurred thought processes."
Id. Nurse Ross had not seen plaintiff between October 23, 2006 and
August 31, 2007.  Decl. of M. Brisbin, Ex. F., 135:19-136:1.

While plaintiff was receiving benefits from defendant,
plaintiff also applied for social security disability benefits.
Although the Social Security Administration concluded that
plaintiff was not disabled, this evidence is not pertinent to this
motion.  As to plaintiff's breach of contract claim, the only
question is whether plaintiff has provided evidence of disability,
not whether there is also evidence of non-disability.  As to the
bad faith claim, because defendant concedes that it did not possess
or consider the SSA's evaluation in terminating plaintiff's
benefits, the SSA's evidence is irrelevant to the question of
whether defendant acted in bad faith.

## II. STANDARD FOR A MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate when it is demonstrated that
there exists no genuine issue as to any material fact, and that the
moving party is entitled to judgment as a matter of law.  Fed. R.
Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157
(1970); Poller v. Columbia Broadcast System, 368 U.S. 464, 467

---

[10] Although both parties attribute this form to Nurse Ross,
the form is signed by Dr. Ecker, and the court has not found any
mention of Ross on the form.

(1962); <u>Jung v. FMC Corp.</u>, 755 F.2d 708, 710 (9th Cir. 1985); <u>Loehr v. Ventura County Community College Dist.</u>, 743 F.2d 1310, 1313 (9th Cir. 1984).

Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" <u>Id</u>. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. <u>Id</u>. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Id</u>. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." <u>Id</u>. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a

genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968); Ruffin v. County of Los Angeles, 607 F.2d 1276, 1280 (9th Cir. 1979), cert. denied, 455 U.S. 951 (1980).

In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Rule 56(e); Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank, 391 U.S. at 289; Strong v. France, 474 F.2d 747, 749 (9th Cir. 1973). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Anderson, 242 U.S. 248-49; Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." First Nat'l

16

Bank, 391 U.S. at 290; T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments); International Union of Bricklayers v. Martin Jaska, Inc., 752 F.2d 1401, 1405 (9th Cir. 1985).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c); Poller, 368 U.S. at 468; SEC v. Seaboard Corp., 677 F.2d 1301, 1305-06 (9th Cir. 1982). The evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam)); Abramson v. University of Hawaii, 594 F.2d 202, 208 (9th Cir. 1979). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the

17

nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

### III. ANALYSIS

Plaintiff brings a claim for breach of contract and a claim for insurance bad faith. Defendant seeks summary judgment on both claims. As explained below, the court denies the motion for summary judgment on both claims.

### A. Breach of Contract

Under California law, a claim for breach of contract includes four elements: that a contract exists between the parties, that the plaintiff performed his contractual duties or was excused from nonperformance, that the defendant breached those contractual duties, and that plaintiff's damages were a result of the breach. Reichert v. General Ins. Co., 68 Cal. 2d 822, 830 (1968); First Commercial Mortgage Co. v. Reece, 89 Cal. App. 4th 731, 745 (2001).

The primary dispute here concerns whether plaintiff was able to perform the functions of her former job when defendant terminated plaintiff's benefits; if she was, defendant had no obligation to pay benefits and termination was not a breach. A secondary dispute is whether, even if plaintiff was unable to perform her job functions, termination was justified by the fact that plaintiff was not regularly seeing a physician during the period in which she claimed benefits.[11] The remaining issues

---

[11] For purposes of this motion, it does not matter whether the "care of a physician" issue is categorized as speaking to breach of performance.

18

raised by plaintiff in opposition to this motion pertain to bad faith, rather than breach of contract.

**1.  Whether Plaintiff Was Disabled**

**a.  Definition of Disability**

The policy defines disability, for purposes of the first two years of a disability claim, as "the complete inability of the employee to perform the material duties" of plaintiff's former position.  Policy, p. 9 (Pl.'s Ex. 7, 20).  This is an "occupational" definition of disability, in that it concerns ability to perform one's own job.  Erreca v. Western States Life Insurance, 19 Cal. 2d 388, 393 (1942).

Plaintiff argues that this definition of disability should be rejected, relying primarily on Erreca and Moore v. Am. United Life Ins. Co., 150 Cal. App. 3d 610 (1984).  Plaintiff does not explicitly advocate any other definition, nor does plaintiff articulate any precise objection to the policy definition. Plaintiff implicitly defines occupational disability as the inability "to perform with reasonable continuity the substantial and material acts necessary to pursue [one's] usual occupation in the usual or customary way."  Moore, 150 Cal. App. 3d at 631 n.12 (affirming use of jury instruction so defining disability).[12]

---

[12]  Erreca and Moore concerned "general" definitions of disability, which define disability as the inability to perform any job, whereas the "occupational" definition at issue here looks to ability to perform the individual's specific prior position.  See Erreca, 19 Cal.2d at 390, 396.  California courts have nonetheless used Erreca in interpreting occupational disability cases. Hangarter v. Provident Life & Accident Ins. Co., 373 F.3d 998, 1006 n.2 (9th Cir. 2004) (quoting Austero v. National Cas. Co., 84 Cal.

Neither party has discussed whether these two definitions differ in any meaningful way.  The parties have not identified any difference between "substantial and material" functions and "essential" functions.  It may be that plaintiff objects to the term "complete inability" to perform the functions of her job.  Plaintiff argues that she is disabled even if she can perform her job sporadically, or if plaintiff would be able to perform if offered an accommodation not realistically available.  However, it is plain English that an essential function of the job is reliable daily performance of the job duties.  With this caveat, "complete" merely distinguishes total disability from partial disability, a distinction consistent with both the terms of the policy and with California caselaw.  In this case, although plaintiff had applied for total disability, defendant concluded that she was not even partially disabled.

If there were a salient difference between the policy's definition and the one used by California courts, California law would require departure from the policy language where "necessary to 'offer protection to the insured when he is no longer able to carry out the substantial and material functions of his occupation.'"  Hangarter v. Provident Life & Accident Ins. Co., 373 F.3d 998, 1006 (9th Cir. 2004) (quoting Austero v. National Cas. Co., 84 Cal. App. 3d 1, 20 (1978)); see also Austero, 84 Cal. App. 3d at 20, overruled on other grounds by Egan v. Mutual of Omaha

App. 3d 1, 20 (1978)) (applying California law).

20

<u>Ins. Co.</u>, 24 Cal. 3d 809, 824 n.7 (1979). Here, absent an argument from plaintiff as to how the definitions differ, the question is moot. If the policy language does not meaningfully differ from the standards embraced by the California cases, deviation from the policy cannot be necessary.

In summary, for purposes of determining whether plaintiff's benefits were properly terminated in June of 2007, "disability" required a showing that plaintiff was unable to consistently perform the material duties of her former office assistant position. Neither party disputes that these duties required plaintiff to consistently work eight hour days, in which she would stand 0-2 hours, walk 0-2 hours, and sit 4-5 hours, occasionally lift or carry 0-10 pounds but not more, use her hands for simple grasping and fine manipulation, and occasionally bend, squat, twist, turn, and reach above her shoulders.

### b.   Evidence of Plaintiff's Disability

Plaintiff's own testimony, Dr. Le's determination that plaintiff was totally and permanently disabled, the post-termination evaluation and plaintiff's poor performance on certain portions of the functional capacities evaluation all constitute evidence that plaintiff was disabled. All of this evidence may properly be considered. Indeed, except for the post-termination evaluation (which obviously was not available at the time), defendant argues that it did consider all of this evidence in reviewing plaintiff's claim, only to conclude that it was outweighed by other evidence. On a motion for summary judgment,

the court does not engage in any such weighing.

Plaintiff extensively argues that an insurer may not ignore an insured's subjective reports of pain, or define disability as including only those conditions demonstrated through objective evidence. Defendant has not contested this position. In general, plaintiff is correct. McCormick v. Sentinel Life Insurance Company, 153 Cal. App. 3d 1030, 1046 (1984); see also Saffon v. Wells Fargo & Co. Long Term Disability Plan, 522 F.3d 863, 872 (9th Cir. 2008) (interpreting ERISA and social security cases), Lester v. Chater, 69 F.3d 1453, 1462-63 (9th Cir. 1995) (social security). Other courts have found that ERISA plans, at least, may explicitly require that claims must be supported by objective evidence, but defendant has not argued that the such a limit may be imposed under California law, or that the plan here included such a limitation. See Sabatino v. Liberty Life Assurance Co. of Boston, 286 F. Supp. 2d 1222, 1231 (N.D. Cal. 2003) (ERISA). Thus, plaintiff's subjective reports could not be disregarded. On the other hand, under ERISA defendant was not "prohibited from taking into account the . . . lack of objective evidence," Moody v. Liberty Life Assur. Co., 595 F. Supp. 2d 1090, 1098 (N.D. Cal. 2009) (ERISA). Even assuming arguendo that this standard applies, this is a credibility determination that cannot be made on summary judgment.

Plaintiff has tendered evidence sufficient to defeat summary judgment on this issue. Dr. Le concluded, in 2006, that plaintiff could not sit, stand, and walk as was required by her office assistant position. Although Dr. Le declined to defend his

22

conclusion after he received the FCE report, Dr. Le did not withdraw his conclusion either. The post-termination evaluation reached the same conclusion in December of 2007. From this evidence, a trier of fact could infer that plaintiff was disabled in June of 2007. Plaintiff's subjective reports, and some of the findings on the FCE report, provide additional support for plaintiff's position.[13]

### 2. Whether Plaintiff Was Required to Remain under the Regular Care of a Physician

The policy provides that "To be considered totally disabled, an employee must also be under the regular care of a physician." Pl.'s Ex. 7, 17. A separate section provided that "You must be under the ongoing care of a Physician in the appropriate specialty as determined by us." Id. at 26.

Plaintiff was not seen by a nurse, physician, or other health care provider between October 23, 2006 and August 31, 2007. Dr. Le last saw plaintiff in July of 2006. Dr. Le concluded that because plaintiff was not a candidate for surgery there was nothing he could do for plaintiff, and he therefore released her from his care. Dr. Clair saw plaintiff for the first and only time in August of 2006, and plaintiff did not receive further treatment from the Northern California Rehabilitation pain management clinic.

---

[13] The question applies both ways, that is the FCE report turns in part on the examiner's evaluation of plaintiff's pain reports. His determination, however, is clearly a subjective judgment. Why the defendant credited his judgment, rather than the plaintiff's report, is an issue for the trier of fact.

Plaintiff saw her primary care provider on October 23, 2006, and was not seen again until August 31, 2007. Dr. Ecker examined her on March 20, 2008.

Defendant assumes, without argument, that because plaintiff was not *seen* by a physician between October 2006 and August 2007, plaintiff was not *under the care of* a physician during that time. Interpretation of the terms of an insurance policy, as interpretation of written contracts generally, is a question of law for the court. See, e.g., Waller v. Truck Ins. Exchange, Inc., 11 Cal. 4th 1, 18 (1995). On defendant's motion, defendant bears the burden of showing that its interpretation is correct. Plaintiff contends that she was under the care of her primary care provider, whom she saw before and after this period, and who during this period determined that plaintiff's prescriptions should be refilled.[14] Moreover, although plaintiff was seen by and communicated with Nurse Ross, some evidence indicates that Nurse Ross was supervised by Dr. Eckler, and that Dr. Eckler was listed as plaintiff's physician. Absent argument from the moving defendant, the court interprets the contract in the light most favorable to the non-moving plaintiff, and assumes that she was

_____

[14] Plaintiff cites Pistorius v. Prudential Insurance Co., 123 Cal. App. 3d 541, 549 (1981) for the proposition that under policy provisions such as the one at issue here, visits to a physician are not required unless they are necessary for treatment. Although the policy in Pistorius contained a seemingly analogous policy provision, the court did not discuss it, and Pistorius, therefore, may be viewed as weak support for plaintiff's argument. On the other hand, it may be that the court thought the proposition so obvious that discussion was unnecessary.

"under the care of" Dr. Eckler.

A separate issue is the policy's distinct requirement that plaintiff be under the care of a physician "in the appropriate specialty as determined by us." Defendant has not addressed whether Dr. Eckler--or anyone else--is a physician in the appropriate specialty. More generally, defendant has not identified the appropriate specialty, nor has defendant argued that it ever made such a determination. Although plaintiff was formerly seen by Dr. Le, a specialist in orthopedic surgery, Dr. Le stopped seeing plaintiff after he determined that she was not a candidate for surgery. It would seem that if surgery was inappropriate, an orthopedic surgeon was no longer the appropriate specialist. Similarly, because plaintiff's condition was caused by a constellation of problems, including degenerative disk disease and fibromyalgia, the appropriate "specialist" may simply have been her primary care provider. On defendant's motion for summary judgment, the burden to show otherwise is on the defendant, and this burden has not been met here.[15]

### 3. Remaining Issues Concerning Breach

Plaintiff raises a number of remaining issues regarding the breach of contract claim, including that defendant separately

---

[15] Plaintiff alternatively contends that even defendant had properly determined that Dr. Eckler was a physician in the appropriate specialty, in that defendant failed to communicate a different determination to plaintiff, and that this failure bars defendant from now arguing that Dr. Eckler was not an appropriate specialist. In light of the court's conclusion above, the court does not address this argument at this time.

breached the contract by failing to fairly and thoroughly evaluate plaintiff's claim. Plaintiff has cited no explicit contractual language imposing any of these obligations. As discussed below, California courts have considered this type of implied duty as an aspect of the implied covenant of good faith and fair dealing, arising under a claim for bad faith rather than for breach of contract.

**B.    Insurance Bad Faith**

Plaintiff's second claim is for insurance bad faith. Plaintiff argues that defendant acted in bad faith by failing to thoroughly investigate plaintiff's claim, by relying on biased investigators, and by denying the claim when the evidence did not reasonably support defendant's position. The court concludes all these issues raise material questions regarding the reasonableness of defendant's position, and that in light of these questions, there are also material questions as to whether defendant's experts were biased.

**1.    Summary of California Law on Insurance Bad Faith**

Under California law, "insurance bad faith" refers to a breach of the implied covenant of good faith and fair dealing as that covenant applies to insurance policies. An insurer breaches this covenant when it acts unreasonably in discharging its obligations under the policy. <u>Crisci v. Security Ins. Co. of New Haven, Conn.</u>, 66 Cal. 2d 425, 430 (1967). Although a claim for breach of the implied covenant of good faith and fair dealing generally sounds in contract, in the insurance context, such a claim also sounds in

tort.  <u>Jonathan Neil & Assoc. v. Jones</u>, 33 Cal. 4th 917, 932
(2004).  Here, plaintiff implicitly seeks to pursue this claim as
a tort, since she seeks punitive damages not available under
contract.  <u>See, e.g.</u>, <u>Mission Ins. Group v. Merco Const. Engineers</u>,
147 Cal. App. 3d 1059, 1065 (1985).

The elements of a claim for tortious insurance bad faith are
that benefits due under the policy were withheld and that the
withholding was unreasonable.  <u>Wilson v. 21st Century Ins. Co.</u>, 42
Cal. 4th 713, 720 (2007).  In this case, because there is a
material question regarding breach of contract, there is
necessarily also a material question as to whether benefits due
were withheld.  The court therefore looks to whether defendant is
entitled to summary judgment on the issue of reasonableness.

Even where benefits are ultimately found to be due, the
withholding was reasonable, and therefore not bad faith, if the
insurer conducted a "thorough and fair" investigation, after which
there remained a "genuine dispute" as to coverage liability.  <u>Id.</u>
at 720, 723 (quoting <u>Chateau Chamberay Homeowners Ass'n v.
Associated Internat. Ins. Co.</u>, 90 Cal. App. 4th 335, 347 (2001));
<u>see also</u> <u>Guebara v. Allstate Insurance Company</u>, 237 F.3d 987, 996
(9th Cir. 1999) (applying California law).  This dispute may
concern the facts or the interpretation of the policy.  <u>Wilson</u>, 42
Cal. 4th at 723.  In general, the questions of whether an
investigation was reasonable and whether a genuine dispute existed
are questions for the trier of fact.  <u>Id.</u> at 724, <u>Hangarter v.
Provident Life & Accident Ins. Co.</u>, 373 F.3d 998, 1010 (9th Cir.

27

2004) (citing Amadeo v. Principal Mut. Life Ins. Co., 290 F.3d 1152, 1161 (9th Cir. 2002)).

**2.    Thoroughness of the Investigation**

Plaintiff first argues that defendant failed to thoroughly investigate plaintiff's claim, in that defendant failed to seek out various pertinent information.  Standing alone, this argument may not raise a material question of bad faith.

First, although plaintiff contends that defendant did not investigate all of plaintiff's health records, plaintiff has not identified any particular records that defendant should have, but did not, consider.  While plaintiff points to evidence of plaintiff's depression and poor sleep, it is undisputed that defendant discovered and provided some discussion of these conditions.  Asire Dec. Ex. A, 34-35, 72.  Thus, while plaintiff disputes whether this evidence supports defendant's position, no evidence indicates that defendant failed to discuss this evidence at all.

Second, plaintiff contends that defendant should have conducted an independent medical examination.  The court is not aware of any authority indicating that such an examination is a prerequisite to a thorough investigation, though, obviously, it bears upon the ultimate issue.  Here, where defendant accepted plaintiff's underlying diagnosis of degenerative disk disease, it may have been proper for defendant to conclude that such an evaluation was unnecessary.  Instead, defendant focused its investigation on the degree to which the disease and other

conditions affected plaintiff's functional capacities. Whether an independent medical examination would have born on that question appears a question of fact.

Third, plaintiff argues that defendant unreasonably failed to properly define "disability" in its communications with Dr. Le. An insurer must communicate with the insured and treating physicians in a manner calculated to elicit an informed response. Hughes v. Blue Cross, 215 Cal. App. 3d 832, 846 (1989); Moore, 150 Cal. App. 3d at 617. Here, the communication accomplished this goal. Dr. Le provided specific opinions regarding what plaintiff could and could not do (in the form of restrictions and statements regarding capacity for hourly activity), as well as his overall assessment of plaintiff as disabled. Because Le provided a fully informed response, any failure on defendant's part to fully define "disability" appears harmless.

Fourth and finally, plaintiff argues that defendant's investigation was incomplete because it ignored plaintiff's subjective reports of pain. Defendant was required to consider these subjective reports. Lester v. Chater, 69 F.3d 1453, 1462-63 (9th Cir. 1995) (social security case). The evidence indicated that defendant did so, but that defendant concluded that plaintiff's statements were outweighed by other evidence, that issue is further considered below.

### 3. Fairness of The Investigation

Plaintiff separately argues that the investigation was flawed because defendant retained biased experts. Bias may prevent an

29

investigation from being thorough and fair, and therefore constitute bad faith. Hangarter v. Provident Life & Accident Ins. Co., 373 F.3d 998, 1010 (9th Cir. 2004) (applying California law). Where there is evidence that the insurer dishonestly selected its experts or that the experts were unreasonable, it is for the jury to decide whether the insurer's investigation was reasonable and fair. Id. (citing Guebara v. Allstate Ins. Co., 237 F.3d 987, 996 (9th Cir. 2001)), Bernstein v. Travelers Ins. Co., 447 F. Supp. 2d 1100, 1113-14 (N.D. Cal. 2006). Few cases have addressed, however, what type of evidence may show bias for purposes of California's law of insurance bad faith. That may be because it is a factual issue determined by the particular circumstances. In any event, in this case, plaintiff's arguments falls into three broad categories.

Plaintiff's first argument is that "Unum Provident," an insurer not party to this suit, had a "notorious" record of bias, and that this bias should be imputed to Disability RMS, the contractor defendant hired to investigate plaintiff's claims in this suit. As evidence of Unum's bias plaintiff cites John H. Langbein, Trust Law as Regulatory Law: The Unum/Provident Scandal and Judicial Review of Benefit Denials under ERISA, 101 Nw. U. L. Rev. 1315 (2007). Plaintiff also refers to various television programs not provided to this court. Defendant objects to introduction of the law review article on the grounds that the article is hearsay and that Unum's history is not relevant to the instant dispute. The court is satisfied that plaintiff has not

laid a proper foundation for the evidence tendered.

Second, plaintiff argues that defendant's biased claim handling is demonstrated by the fact that Stockton Unified School District terminated its contract with defendant, purportedly on the basis of employee complaints. Plaintiff contends that a large percentage of claims were "approved for a short period of time, then closed." Pl.'s Statement of Facts, ¶ 276. The proportion of claims granted, absent any evidence regarding the proportion of claims that were meritorious, does not directly demonstrate bias in claim handling. Plaintiff provides *no* evidence of this kind. Accordingly, the court grants defendant's objections to the introduction of plaintiff's exhibits 23 and 26. Plaintiff's argument regarding the Stockton Unified School District's cancellation of the policy, absent admissible evidence of the reasons, does not support the claim of bias.

Third, plaintiff argues that the experts Steven Moon, Nurse Girard, and Doctor Wagner had economic incentives to produce opinions favorable to defendant.[16] A district judge has written that "[t]he *mere* fact that these doctors have been hired by insurers rather than insureds does not support bias. Indeed, if this were the case, then most experts in any case would be deemed bias[ed]." Cardiner v. Provident Life & Accident Ins. Co., 158 F.

---

[16] For example, Dr. Wagner noted that her work for UDC, such as her work in this case, is done from a different perspective than her work on behalf of the State of Massachusetts. PSOF 178, 173-181. Plaintiff also introduces an unauthenticated purported copy of Moon's letterhead, which states that he is a "'One Call Solution for Case Resolution.'" PSOF ¶¶ 272-274.

Supp. 2d 1088, 1101 (C.D. Cal. 2001) (emphasis added). On the other hand, obviously the fact that the company paid the experts is a fact that the trier of fact may consider.

Plaintiff does not provide any authorities specifically addressing this issue, i.e., proof of bias in state law insurance bad faith claims. Instead, plaintiff cites three ERISA cases which extended limited deference to expert and insurer conclusions. Moody v. Liberty Life Assur. Co., 595 F. Supp. 2d 1090, 1100 (N.D. Cal. 2009), Velikanov v. Union Sec. Ins. Co., 626 F. Supp. 2d 1039, 1051 (C.D. Cal. 2009), Caplan v. CNA Fin. Corp., 544 F. Supp. 2d 984, 992 (N.D. Cal. 2008).[17] In each of these cases, the court noted that the experts or insurer had a financial incentive to provide opinions favorable to the insurer, and that this was some evidence of a conflict of interest. Nonetheless, none of these cases found this factor sufficient, and each relied on the unreasonableness of the position as a further reason to limit the degree of deference afforded. Moody, 595 F. Supp. 2d. at 1101 ("Liberty rejected Moody's claims of cognitive impairment without any basis. Liberty also ignored the physical requirements of

_____

[17] When an ERISA plan explicitly provides that the plan administrator has discretion to determine eligibility for benefits, the administrator's decisions are ordinarily reviewed under an abuse of discretion standard. Metropolitan Life Ins. Co. v. Glenn, ___ U.S. ___, ___, 128 S.Ct. 2343, 2347 (2008) (quoting Firestone v. Bruch Tire & Rubber Co., 489 U.S. 101, 111-113 (1989)). Where there is evidence that the administrator's interests were conflicted, however, the court reviews the administrator's decisions with "enhanced skepticism." Montour v. Hartford Life & Accident Ins. Co., 588 F.3d 623, 631 (9th Cir. 2009) (citing Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 969 (9th Cir. 2006) (en banc)).

Moody's job as stated by its own evaluators."), <u>Velikanov</u>, 626 F. Supp. 2d at 1051-52 (first expert reached factual conclusions not supported by or connected to the evidence, and second expert based his opinion on an incorrect understanding of the first's diagnosis), <u>Caplan</u>, 544 F. Supp. 2d at 992 (expert report, and insurer's reliance thereon, disregarded a wealth of contrary evidence). The specific question confronted by these ERISA cases differs from that at issue here--the ERISA cases asked whether the court should defer to expert's findings, whereas this case requires a determination of whether the insurer permissibly relied on the experts. Nonetheless, the reasoning underlying these opinions applies here.

As explained in the following section, this case is similar to <u>Moody</u>, <u>Velikanov</u>, and <u>Caplan</u>, in that plaintiff supplements the evidence of a conflict of interest with the argument that the experts' opinion was not a reasonable interpretation of the available evidence. This combined showing suffices to raise a material question as to bias.[18] On defendant's motion for summary judgment, the court need not decide precisely how much weight should be afforded to the showing of a conflict of interest. The court merely decides that the allegation of bias may proceed to the jury, together with the allegation that the insurer's evaluation of the evidence was unreasonable. <u>See also</u> <u>Origel v. Northwestern Mut. Life Ins. Co.</u>, C-05-4633, 2008 U.S. Dist. LEXIS

---

[18] <u>Cardiner</u> is distinct because in that case there was no challenge to the substance of the expert opinion.

95172 (N.D. Cal. Nov. 14, 2008) (Spero, Magistrate Judge) ("A reasonable jury could find that Defendant chose to ignore the informative aspects of the reports, focusing only on the missing documents, as some evidence of bias. . . . Defendant's argument is better suited for trial -- when Plaintiff will bear the burden of proof.").

**4.  Defendant's Interpretation of The Available Evidence**

Finally, putting aside the questions of whether the investigation was thorough or fair, material questions remain as to whether there was a "genuine dispute" as to plaintiff's disability.  <u>Wilson</u>, 42 Cal. 4th at 723.  "'[A]n insurer is not entitled to judgment as a matter of law where, viewing the facts in the light most favorable to the plaintiff, a jury could conclude that the insurer acted unreasonably.'" <u>Id.</u> at 724 (quoting <u>Amadeo</u>, 290 F.3d at 1161–1162).

A jury could conclude that defendant unreasonably ignored the limits imposed by Dr. Le.  In denying plaintiff's appeal, defendant discussed Dr. Le's conclusion that plaintiff could not lift, push or pull more than five pounds.  Asire Decl. Ex. A. 37.  Defendant did not mention Dr. Le's limits with regard to time spent sitting, walking, or standing, however, and these limits were arguably more important to plaintiff's disability claim.  <u>Id.</u>  Similarly, while Dr. Wagner concluded that plaintiff could perform abstract sedentary work provided that she could change posture as needed, Dr. Wagner did not discuss the duties of plaintiff's own job, and whether this job afforded an opportunity to change position,

despite the fact that plaintiff's claim was denied during the "occupational" period of disability coverage.  Asire Decl. Ex. A, 67.  Finally, although the record indicates that defendant discussed plaintiff's subjective reports, and defendant was permitted to consider whether these reports were additionally supported by objective evidence, a jury could conclude that defendant unreasonably afforded too little weight to these reports.  Accordingly, there is a material question as to whether defendant's conclusion that plaintiff was not disabled was reasonable.

**C. Punitive Damages**

Insurance bad faith sounds in tort, and is a type of claim for which punitive damages are available.  Because material questions remain as to the bad faith claim, the motion for summary judgment on the issue of punitive damages is denied.

**IV.  CONCLUSION**

For the reasons stated above, defendant's motion for summary judgment (Dkt. No. 48), is DENIED.

IT IS SO ORDERED.

DATED:  March 25, 2010.


LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT